UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORI WALTON,

    Plaintiff,

Case No. 2:08-cv-15084

HONORABLE STEPHEN J. MURPHY, III

v.

BEST BUY COMPANY, INC., et al.,

    Defendants.
                                      /

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This is an action for violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq., the Civil Rights act of 1991, Pub. L. 102-166 and the Michigan Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2201 et seq. ("ELCRA"). The plaintiff is Lori Walton, a mother of two young children. The defendants are Best Buy Companies, Inc., a Minnesota corporation, and Best Buy Stores, L.P., a Delaware limited partnership (collectively "Best Buy"). Jurisdiction is premised on 28 U.S.C. § 1331 and 1367.

Before the Court is defendant's motion for summary judgment. Best Buy argues that summary judgment is appropriate on statute of limitations grounds as to Walton's claims under the ELCRA concerning conduct that took place prior to December 9, 2005 and as to claims under Title VII concerning conduct that took place prior to April 9, 2007. Best Buy argues, further, that Walton has failed to establish a prima facie case under either statute as to those claims that are not time barred. For the reasons stated below, the Court will grant Best Buy's motion as to the statute of limitations but will deny it as to Walton's prima facie case.

The plaintiff has cross-moved for a continuance to permit her to gather more discovery in order to respond to defendants' motion for summary judgment, and has filed a Rule 56(f) Affidavit in support of this argument. The Court held a hearing on the cross motions on April 27, 2010. At the hearing, the Court granted the plaintiff leave to supplement her opposition to summary judgment with additional information obtained. The parties filed supplemental briefs addressing the additional information. The matter is now fully briefed and ripe for determination.[1]

## FACTS

Walton was hired by Best Buy in May 2000 in the position of Customer Service Representative II at Best Buy's Okemos, Michigan store. She was promoted to the position of Inventory Senior at the Okemos store in September of the same year, and in December of the same year she was promoted to Loss Prevention Supervisor. Amended Complaint, ¶¶ 16-18. She graduated from Michigan State University with a Bachelor of Arts Degree in Psychology in 2001. *Id.* ¶ 15. Walton was promoted to the position of Merchandising Manager in August 2001 and was promoted to the position of Inventory Manager in July 2002 for the Lansing store grand opening. *Id.,* ¶ 18.

In July 2003, Walton applied for and accepted the position of Inventory Supervisor at Best Buy's Brighton Store. The position was a step down from her previous position at the Lansing Store, but the Brighton store was closer to home.

In August 2003, Walton became pregnant with her first child. Thereafter, a male co-worker began to make harassing comments to Walton, including telling her he found pregnant women to be "hot" and he would like to "f\*\*k a pregnant woman." Amended

---

[1]As the Court has already permitted the plaintiff to supplement her filings and has considered the supplemental material in deciding the pending motion, the Court will deny as moot plaintiff's motion for a continuance, filed on November 25, 2009.

2

Complaint, ¶ 21. He also began to wait in the parking lot for her to exit after closing. *Id.* Walton reported the co-worker's actions to Best Buy management. At the request of the store's general manager, and with a promise of confidentiality, Walton prepared a written complaint detailing the co-worker's actions. Best Buy management subsequently told Walton that the co-worker had denied the allegations, and because they had no proof to substantiate the allegations, they could do nothing. Walton was told that she could not transfer to another store, and that it would be a "terrible career decision" for her not to return to work at the Brighton store. Walton returned to work in the belief that she would be demoted or fired if she did not return.

In March, 2004, when Walton was eight months pregnant with her first child, she was selected to fill a Supervisor of Product Process position at Best Buy's Rochester store. Walton dep. 107-110. Best Buy was restructuring positions, and combined three positions into one job: the Inventory Supervisor's position that Walton held at that time, a Loss Prevention Supervisor position, and a Merchandising Supervisor position. *Id.,* 107. Walton was selected for this position over two male employees - the Loss Prevention Supervisor and the Merchandising Supervisor. *Id.,* 108.

On April 2, 2004, Walton gave birth to her first child.

In July of 2004, Walton applied for a promotion to the position of Product Process Manager at the Rochester Hills store. Best Buy management told Walton that the position would entail working a lot of hours and that, because she had a child, she would be better off with the position of Product Process Supervisor, a lesser-paid position. Walton was transferred to the Product Process Supervisor position at the Rochester Hills store, and the Product Process Manager position was given to an allegedly less-well qualified male employee who had children. Amended Complaint ¶ 29-30.

3

In October, 2004, Walton was transferred to the position of Media Supervisor at the Madison Heights store. Walton alleges that Best Buy management at the Madison Heights pressured her to attend social events after work with other supervisors and employees. Walton told Best Buy management that she was not available to attend these outings because she needed to be home with her children. Walton alleges that she was singled out and subjected to hostile and derogatory comments by her supervisors when she declined to attend these outings, but male employees with children also declined to attend these outings and were not subject to hostile and derogatory comments.

In October 2005, Walton requested a day off from work in order to attend her child's christening. She requested leave several weeks in advance and leave was approved but, shortly before the day of the christening, Best Buy management told Walton that she would be required to come into work on the christening date. Amended Complaint ¶ 32. Walton testified that the reason her leave was revoked was that the store's physical inventory was scheduled to be conducted the same day. Walton dep. p. 79-80. Walton stated that it was her belief that a male employee was not required to come into work on the day of his child's christening, although Walton could not recall if there was a physical inventory scheduled that day. *Id.,* 80-81.

In October 2005, Walton became pregnant with her second child. Her second pregnancy was a difficult one, and her physician advised her that there was a possibility that she had placenta previa, a serious medical complication. Walton dep. 119-120. Walton told her manager, Jim Altene, that she was having contractions and Altene required her to have a doctor's note faxed to the store in order to leave the store. *Id.* Walton had her doctor fax a note to Best Buy. Walton dep. 120-21. Walton went to the emergency room.

4

When she was discharged, Walton was put on bed rest for the remainder of her pregnancy. Amended Complaint ¶ 36-37; Walton dep. 113, 123.

In May 2006, while on bed rest, Walton inquired about the position of Product Process Manager at Best Buy's Roseville store. Walton dep. 115. Walton was told over the phone by Jan Baggett, the manager of the Roseville store, that Walton was not selected for the position because she was pregnant. *Id.,* 116. The position was given to a man with children. *Id.,* 117.

In July 2006, Walton gave birth to her second child. Amended Complaint, ¶ 39. Walton's FMLA leave expired on July 19, 2006, at which point she was on medical leave until she returned to work on August 1, 2006. Walton dep. 113-114.

In October 2006, Walton was promoted to the position of Product Process Manager ("PPM") at the Madison Heights store. Walton dep. 112-15. She was promoted into that position by Aaron Simpson, the Madison Heights' general manager. *Id.,* 114-115. As PPM, Walton was responsible for 30 to 40 employees comprising the merchandising, inventory and loss prevention teams. *Id.,* 127, 131. The merchandising team was responsible for making sure the product was on the floor, that it looked neat, and that it was priced correctly. *Id.,* 127. The inventory team was responsible for keeping track of the product that was coming into the store, making sure it made its way onto the shelves, making sure broken items were returned and keeping accurate count of inventory. *Id.,* 127. Loss prevention was responsible for making sure product did not leave the store without being paid for. *Id.,* 128.

Walton acknowledged in her deposition that she struggled in each aspect of the job. Walton dep. 197. Walton acknowledged that she was struggling with the merchandising component of the PPM job. Walton dep. 140, 149-150. She also stated that she was

5

struggling with Best Buy's online site, Bestbuy.com, and that she "really didn't understand it." *Id.*, 155-56. Walton also admitted that the store kept losing "massive quantities" of inventory. *Id.*, 156. For example, 20 Ipods were missing on one occasion and 700 CDs on another. *Id.*, 156-57. Walton acknowledged that she did not completely understand Best Buy's "end of life" ("EOL") process and described it as "fairly broken." *Id.*, 155. Walton also stated in her deposition that loss prevention in the Madison Heights store did not have the respect of other store employees, unlike loss prevention in other Best Buy stores. *Id.*, 159-60. Walton acknowledged that the store was not meeting budget or goals set by Best Buy. *Id.*, 139-40. Walton also testified that she did not have a good working relationship with other managers at Best buy Madison Heights. She testified that "the store was in such disarray ... that while it appeared as though we were functioning as a team, it was more everybody's out for themselves." *Id.*, 136-37. Walton's Round Table (peer review) results were beneath minimum expectations, 3.31, 2.82, 3.24 and 3.19 on a 5 point scale, where 3.75 was the minimum expectation. *Id.*, 222-23. On July 3, 2007, Walton counted over $7,000 in shrink (missing inventory) for the week, which was an extremely large number. Exhibit F.

Walton alleges that soon after she accepted the promotion to PPM, Best Buy management intensified the pressure on her to attend after work social outings. Amended Complaint ¶ 41. When Walton said that she could not attend the outings because of her parental responsibilities, Walton alleges that Best Buy subjected her to hostile comments and unfairly and negatively evaluated her job performance and discriminated against her in other ways, in an effort to either set her up for termination or force her to resign. *Id.*

In July 2007, Simpson put Walton on performance improvement plan ("PIP"). Walton dep. 165-68. Walton alleges that similarly situated male employees with children and

female employees without children with worse job performance records than Walton's were not placed on PIPs. In response, Walton sent a memo to Best Buy's Human Resources Manager, Rich Martin. In that memo, Walton complaining about being put on the PIP but did not indicate that she thought she was being discriminated against. Motion for Summary Judgment, Exhibit H. Simpson was removed from his position as general manager of the Madison Heights store in mid-July 2007, before Walton could complete the PIP. Walton dep. 179

In late July, 2007, Melanie Cornell replaced Aaron Simpson as General Manager of the Madison Heights store. Walton dep. 129, Cornell dep. 115. Cornell had supervised Walton several years earlier at the Best Buy Brighton store. Walton dep. 179. Walton testified in her deposition that Cornell had treated Walton unfairly at the Brighton store when Walton was pregnant with her first child, including not permitting Walton to leave early on Christmas Eve. *Id.*, 181. Walton speculated in her deposition that in the 2003-2004 time period, Cornell felt that Walton was "a matronly, not so fun mom" and therefore assigned Walton "petty, silly tasks." *Id.*, 180.

Cornell did not see the PIP that Simpson had issued to Walton until Walton showed it to Cornell. Cornell dep. 126-27. A couple of weeks after Cornell replaced Simpson, Cornell took Walton off the PIP. Walton dep. 192.

Walton testified in her deposition that, some time after Cornell took over, Walton worked a six to four shift at the store, and was still there two hours later at 6:00 p.m., at which time Walton told Cornell that she had to leave to pick up her children at daycare. Walton dep. 193-94. Walton testified that Cornell "was very angry." *Id.*, 194. The next day, Walton spoke with Cornell over the telephone about the incident. According to Walton, Cornell said that she didn't "work with people that have kids so we're going to have to figure

7

something out." *Id.* Walton also testified that Cornell stated in the same conversation that she "didn't have to do this before with the management team in my store before" and that "[t]he only manager I had that was female didn't have kids." *Id.*, 195.

Later in August 2007, Walton told Best Buy management that she wanted to work a Monday through Friday dayshift schedule, which included working one closing shift per week, in order to spend more time with her children. Amended Complaint ¶ 47. Walton alleges that she was told by Best Buy management that employees in the Product Process Manager position were not allowed to work such a schedule and that if Walton's children were presenting an "obstacle" to her doing her job, she should consider stepping down from her position. Walton alleges on information and belief that male Product Process Managers with children and female Product Process Managers without children were routinely allowed to work a Monday through Friday dayshift schedule. Amended Complaint ¶ 48.

Cornell put Walton on another PIP on October 3, 2007. Walton alleges on information and belief that Best Buy management pressured Cornell to place Walton on the PIP. Amended Complaint ¶ 49. In support of this allegation, Walton testified that Cornell told her at the time that Cornell didn't want to place Walton on the PIP, but that "the district staff was making her do it." Walton dep. 263. Walton was told that if the plan was not 100% completed by November 3, 2007 her employment would be terminated, but that if she wished to step down to a supervisor's position at any time during the plan that she would be allowed to do so. Exhibit J. Walton alleges on information and belief that Best Buy routinely allowed employees 40 to 60 days to complete PIPs. Amended Complaint ¶ 50. Walton alleges that the PIP was not reasonably attainable and was intended to ensure her failure. Amended Complaint ¶ 51. Walton also alleges that Best Buy deliberately failed to

8

supply her with the administrative support it normally supplies to similarly situated employees completing a PIP, in order to cause her to fail. *Id.*

Cornell met with Walton weekly to review her progress in meeting the PIP. On the October 11, 2007 review (Exhibit K), Cornell notes the following areas were expectations were not being met:

- CMA ["customer merchandising assessment"] results not up to minimum expectations

- Planogram completion not done

- Media wherehouse [sic] not meeting minimum expectations as 2nd showroom

- Care & process in media not meeting minimum expectations behaviors of contract not landed. Also CSA program not being followed per SOP.

- Shrink culture not meeting minimum expectations. The barometer is not updated and employees cannot speak to shrink numbers.

On her October 19 review (Exhibit L), Cornell noted the following:

- CMA results not up to minimum expectations

- Dot.com fill rate not meeting expectations. Acknowledgment time not meeting expectations

- Care & process in media not meeting minimum expectations. Behaviors of around care & CSA program have not been landed

- Shrink culture, the barometer was updated, however the minimum expectations have not been landed around the shrink. Inv. sup [individual supervisors] could not even speak #'s

Cornell also noted on the review:

- Had a conversation with Lori about how the minimum expectations are not being met on this plan. Lori has said she wants to step down but I told her to think about it till Monday & give an answer then.

The final review, dated October 26, 2007, noted the following:

- MOD [manager on duty] issues - not meeting minimum expectations in a timely mannor [sic] see attached statement

9

- CMA results not up to minimum expectations

- Dot.com fill rate not meeting expectations. Acknowledgment time not meeting expectations

- Planogram completion, not completed

- Sold Order process not up to minimum expectations

- Running Floor - not meeting minimum expectations

- Care & Behaviors around CSA & Care not landed in Media

- Shrink Culture - barometer not updated and behaviors not landed

Cornell also noted in this review:

- Last week Lori decided not to step down & to continue the Plan.

- Today I had a conversation with Lori stating that she is still not meeting minimum expectations on this improvement plan. I also stated to Lori that in a week's time (which is the end of the PIP) this plan will be considered failed and Lori's employment will be terminated. At that time I informed Lori that I have spoken to the District Staff and if she wanted to step down we can offer her a [] supervisor position @ store 407. We also offered her a max pay rate of $19.72 per hour. Lori turned it down stating she would finish the plan & if we had to fire her at least she could say she tried.

Walton left for vacation on the final week of the plan. Walton testified that she took her vacation during the final week of the plan because she had been asked "on multiple times to move this particular vacation to accommodate men with children in our store" and "it was clearly expressed to me not just by Melanie but by other managers and employees that it didn't matter what I did at that point." Walton dep. 224. Walton was terminated on November 1, 2007. Walton alleges that she was terminated despite the fact that she had substantially completed the PIP and despite the fact that the PIP time period had not yet expired.

Walton filed her Charge of Discrimination with the Michigan Department of Civil Rights and the U.S. Equal Opportunity Commission on February 1, 2008. The EEOC issued a

Notice of Right to Sue on September 11, 2008. Walton filed the complaint in this action on December 8, 2008.

## ANALYSIS

Best Buy moves for summary judgment on two grounds. First, Best Buy moves for partial summary judgment as to certain conduct alleged by the plaintiff on the grounds that any claim based upon such conduct is barred by the relevant statute of limitations. Second, Best Buy asserts that Walton fails to establish a prima facie case under either the ELCRA or Title VII and therefore summary judgment is appropriate as to those claims also.

I. <u>Statute of Limitations</u>

Walton filed her charge of discrimination on February 1, 2008, and filed her complaint in this matter on December 8, 2008. In her complaint and amended complaint, Walton alleges acts dating back to 2003. Defendants argue, however, that plaintiff's Title VII claims prior to April 9, 2007 are time barred, as are her Elliot Larsen Civil Rights Act ("ELCRA") claims prior to December 9, 2005.

The statute of limitations for claims arising under ELCRA is the three year period for other personal injury actions contained in Mich. Comp. Laws § 600.5805(10). *Garg v. Macomb County Community Mental Health Servs.*, 472 Mich. 263, 278 (2005). The statute of limitations for claims under Title VII is even more restrictive, barring recovery for employment discrimination that occurred more than 300 days before the plaintiff filed an EEOC charge. 42 U.S.C. § 2000e-5(e)(1); *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 386 n.2 (6th Cir. 2009).

Walton argues in response that her allegations regarding earlier events are not barred because they are part of a discriminatory pattern and practice of harassment and unfair denial of promotions culminating in the termination of Walton's employment and are

11

therefore recoverable under *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2001). Defendants argue that plaintiff's argument was rejected by the Supreme Court in *Morgan,* by the Sixth Circuit in *Hunter v. Secretary of the Army*, 565 F.3d 986, 994 (6th Cir. 2009), and by the Michigan Supreme Court in *Garg*.

The Court agrees with the defendants that the continuing violation theory does not apply to plaintiff's claims in the present action under *Hunter*. In *Hunter*, the plaintiff asserted that he was denied numerous opportunities for training and promotion due to his race and age. The district court dismissed plaintiff's claims on the grounds that they were barred because Hunter had failed to seek EEO counseling within 45 days of any of these discrete acts of discrimination. Hunter argued on appeal that these claims should have been considered as part of an ongoing pattern and practice of discrimination.

The Sixth Circuit affirmed the district court, holding that the court was correct in considering Hunter's claims of denial of training and promotion as discrete acts of discrimination.

> Under Title VII, two types of actions may be brought: (1) "discrete discriminatory acts," and (2) claims alleging a "hostile work environment." See *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). *Morgan* sets forth a list of discrete acts, which includes "acts such as termination, failure to promote, denial of transfer, or refusal to hire." Id. at 114.
>
> In contrast, hostile-work-environment claims "involve[ ] repeated conduct" and require the plaintiff to demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. at 115-16 (internal quotation marks omitted). The failure to promote an employee or select him for a training program is a discrete act that cannot alone amount to a hostile work environment. See, e.g., *Jones v. City of Franklin*, 309 Fed.Appx. 938, 944-45 (6th Cir.2009) (distinguishing the plaintiffs' discrete-discriminatory-act claims based on failure to promote from hostile-work-environment claims).

*Hunter v. Secretary of U.S. Army* 565 F.3d 986, 993 -994 (6th Cir. 2009).

Pursuant to the authority of *Hunter*, therefore, Walton's claims fall into the first category, discrete discriminatory acts, which do not alone constitute a hostile work environment. They do not allege that Walton's workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Morgan*, 536 U.S. at 114.

The Michigan Supreme Court has also made it clear that there is no continuing violation theory available to plaintiffs to resurrect time-barred claims. *Garg,* 472 Mich. at 278. Thus, plaintiff's ELCRA claims prior to December 9, 2005 are also foreclosed by the applicable statute of limitations.

This conclusion is reinforced by the fact that plaintiffs' claims in this action regarding other stores and other managers are not encompassed within her EEOC charge. A plaintiff cannot bring Title VII claims in a lawsuit that are beyond the scope of her EEOC charge. *Jones v. City of Franklin*, 309 Fed. Appx. 938, 945 (6th Cir. 2009). Here, plaintiff's EEOC charge relates solely to plaintiff's interaction with her last General Manager Melanie Cornell, including Cornell's comment that she had a hard time working with people with children, Cornell's placing Walton on the PIP and her termination on November 1, 2007. See Exhibit P. There are no allegations regarding plaintiff's other supervisors or coworkers or other Best Buy locations. The allegations in Walton's complaint related to other managers and other stores go beyond the scope of Walton's EEOC charge.

Under the relevant caselaw and the undisputed facts, the Court finds that plaintiff's Title VII claims prior to April 9, 2007 are time barred, as are her Elliot Larsen Civil Rights Act ("ELCRA") claims prior to December 9, 2005. The Court will therefore grant the defendants partial summary judgment as to all discrimination claims prior to those dates.

13

II.  Can Walton Establish a Prima Facie Case as to Her Remaining Claims?

Defendants argue that once the time-barred allegations are removed, the sole allegations remaining in the lawsuit are (1) Walton's claim that on two occasions, once in April 2006 and again on July 4, 2007, Walton was asked to provide a doctor's note to excuse her absences; (2) Walton's claim that in May 2006, while she was on bed rest awaiting the birth of her second child, Walton inquired about a Product Process Manager position and was told that she wouldn't be hired because she was pregnant; (3) her claim that Cornell pressured her to go out after work and have drinks with colleagues; (4) her claim that she was put on two Performance Improvement Plans in 2007; and (5) the termination of her employment on November 1, 2007.

Walton's complaint alleges "sex-plus" discrimination.  To establish a claim of "sex-plus" discrimination, Walton must establish that she was subject to disparate treatment based on her gender considered in conjunction with a second characteristic.  *Derungs v. Wal-Mart Stores, Inc.*, 374 F.3d 428, 439 n. 8 (6th Cir. 2004).  Walton claims specifically that she was discriminated against because she was a woman with children.

The same evidentiary framework applies both to Walton's Title VII claims and to her claims brought under the Elliott-Larsen Act.  *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).  A plaintiff in a Title VII action for employment discrimination may establish discrimination either by introducing direct evidence of discrimination or by offering circumstantial evidence from which a jury could infer discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).

   A.  Direct Evidence of Discrimination

Direct evidence of discrimination is evidence which, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's

actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). "[D]irect evidence is found ... where an employer's policy is discriminatory on its face or where a statement by an employer directly shows there is a discriminatory motive." *Bush v. Dictaphone Corp.*, 161 F.3d 363, 370 (6th Cir. 1998) (quoting *Schlett v. Avco Fin. Services, Inc.,* 950 F. Supp. 823, 828 (N.D. Ohio 1996)). Furthermore, "statements that are 'unrelated to the decisional process' at issue, do not constitute 'direct evidence.'" *Bolander v. BP Oil Co.*, 128 Fed. Appx. 412, 416 (6th Cir. 2005) (quoting *Bush*, 161 F.3d at 369).

There is no facially discriminatory policy alleged. Plaintiff, however, alleges that certain statements by her last General Manager, Melanie Cornell, constitute direct evidence of discrimination. According to Walton, Cornell told Walton that she (Cornell) didn't "really work well with people that have kids. So we're going to have to figure something out." Walton dep. 194. Walton also testified that Cornell stated in the same conversation that she "didn't have to do this before with the management team in my store before" and that "[t]he only manager I had that was female didn't have kids." Walton dep. 195. Walton testified that Cornell told her on other occasions that she didn't work with women that had children. Walton dep. 238.

The Court finds that these statements are sufficient direct evidence of discrimination to state a prima facie case of sex-plus discrimination. Walton testified that Cornell specifically stated that she did not work with women with children. These statements are sufficiently temporally and causally connected to Walton's termination. They were made within a month or two of the date that Walton was placed on her second PIP and they were made by Cornell, the person who placed Walton on her second PIP. *Cf. Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1249 (6th Cir. 1995) (evidence that plaintiff's

employers occasionally made racist comments held to be direct evidence of discrimination in Title VII case alleging racially motivated firing); *DiCarlo,* 358 F.3d at 416 (disparaging comments by individual with decision making authority over plaintiff held direct evidence of discrimination). Plaintiff has thus come forward with sufficient direct evidence of discrimination to meet her initial burden on summary judgment.[2]

### C. Defendants have met their burden of production

Once the plaintiff establishes her prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment action. If the employer articulates a legitimate, non-discriminatory reason for its action, the burden shifts to the plaintiff to come forward with admissible evidence showing that the employer's articulate reason is just a pretext for unlawful discrimination. Best Buy argues that even if the Court finds that the plaintiff has established a prima facie case of "sex-plus" discrimination under the *McDonnell Douglas* burden shifting analysis, summary judgment is still appropriate because Best Buy has met its burden of articulating a legitimate, non-discriminatory reason for its termination of Walton and Walton cannot come forward with admissible evidence showing that the articulated reason is pretextual.

Best Buy has met its burden of articulating a legitimate, non-discriminatory reason for terminating the plaintiff. Best Buy has provided testimony and documents supporting its assertion that Walton was terminated for poor job performance. The plaintiff in fact admits in her deposition that she was not performing well, but argues that Best Buy was holding

---

[2]The plaintiff also argues in the alternative that she can establish her prima facie case through indirect evidence under the *McDonnell Douglas* framework. As the Court determines that the plaintiff has presented sufficient direct evidence to avoid summary judgment, it will not reach the question of whether the plaintiff has also stated a prima facie circumstantial claim.

her to different standards than other employees and that Best Buy set her up for failure by not training or supporting her work.

Because the defendant has articulated a legitimate reason for terminating the plaintiff, the burden shifts to the plaintiff to come forward with evidence showing that the articulated reason is simply a pretext for illegal discrimination. To show pretext, the plaintiff must come forward with evidence showing that the articulated reason either has no basis in fact, that it was not the actual reason motivating the decision, or that the facts offered to support the decision were jointly insufficient to justify the decision. *Feick v. County of Monroe*, 229 Mich. App. 335, 343 (1998). Defendant cites authority for the proposition that an employee does not raise a material issue of fact by claiming that her work performance was better than the employer evaluated it to be, *McDonald v. Union Camp Corp.* 898 F.2d 1155, 1160 (6th Cir. 1990), and that a plaintiff cannot simply show that the employer's decision was wrong or mistaken, but must offer evidence to show that it was prompted by a discriminatory animus. *Hazel v. Ford Motor Co.*, 464 Mich. 456, 476(2001). On the other hand, there is authority for the proposition that a factfinder may infer discrimination based on a rejection of the defendant's proffered reason, and in such a case, the factfinder is permitted, but not required, to infer pretext. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 146 (2000).

Viewing the facts in the record in the light most favorable to the plaintiff, the Court finds that the plaintiff has submitted sufficient evidence from which a rational factfinder could conclude that the employer's articulated reason for terminating the plaintiff was a pretext for unlawful discrimination. While there is clearly a basis in fact to support Best

17

Buy's contention that the plaintiff was terminated because of performance issues, the Court cannot hold as a matter of law at this stage that no rational jury could conclude otherwise. There is sufficient evidence in the record for a jury to conclude, on the other hand, that the plaintiff's failure to perform well was due to the fact that the defendant was not giving her training opportunities that it provided to others and the reason for failing to train her was that she was a mother of young children. The plaintiff has submitted evidence from with a jury could choose to disbelieve the employer's articulated reason for terminating the plaintiff. Defendants' motion for summary judgment will therefore be denied.

## ORDER

For the reasons stated above:

Plaintiff's motion for a continuance to permit additional discovery (docket no. 38) is **DENIED AS MOOT**.

Defendants' ex parte motion for leave to file excess pages (docket no. 61) is **GRANTED**.

Defendant's motion for summary judgment (docket no. 23) is **GRANTED IN PART AND DENIED IN PART**.

**SO ORDERED**.

                                           s/Stephen J. Murphy, III
                                           STEPHEN J. MURPHY, III
                                           United States District Judge

Dated: August 17, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 17, 2010, by electronic and/or ordinary mail.

                                           Alissa Greer
                                           Case Manager